[PHILADELPHIA, FEBRUARY 14, 1835.]

## PERIT and Another *against* PITTFIELD and Others Assignees of FOLWELL.

Property placed by the debtor, in the hands of the creditor is not to be construed as having been received in full discharge of the debt, unless that plainly appears to have been the intention of the parties.

When therefore, *F.* had borrowed the note of the plaintiff, engaging to provide for it, if not paid out of funds shipped to Gibraltar, and afterwards borrowed from him another note, declaring in the receipt given for it, that he had endorsed a bill of lading for goods as a collateral, after which, the parties entered into an agreement under seal, which after reciting, that *A.* was desirous of securing to plaintiffs, the full amount of their note, transfers to them coffee and other merchandize, expected to arrive from abroad, " to have and to hold for the payment of their debt," stipulating that whatever sum might remain in the hands of the plaintiffs, from the net proceeds of the coffee or other merchandize, after payment of the debt, should be returned to *F.* or his assigns, it was held, that this agreement constituted the assignee, not the sole but the qualified owner of the merchandize, transferring to him an interest in it only, as a collateral security, that the relation of debtor and creditor, still continued between the assignor and assignee, and that consequently, the assignee having sold the merchandize fairly on account of the assignor, and a loss having happened without his fault, no more of the debt to him was cancelled, than the amount of money received by him, from the estate of the vendee.

Nor is the debt discharged by a compromise, entered into by the plaintiffs with the vendee with the assent of the defendants, the assignees of *F.*

When more than one of several persons, liable to the payment of a note, have made voluntary assignments for the payment of their debts, the amount actually due on the note, at the times respectively, when dividends are declared, is to be taken as the sum on which the percentage is to be estimated.

THIS case was tried before Chief Justice GIBSON, at *Nisi Prius,* and a verdict taken for the plaintiffs by agreement, subject to the opinion of the Court in Bank, as to the right of the plaintiffs to recover.

It was an action brought by the plaintiffs, to recover from the estate of *John Folwell,* in the hands of the defendants, as his assignees, the amount of certain dividends declared by the defendants under the assignment. The plaintiffs and *Folwell* were merchants in Philadelphia, and to explain the nature of their transastions, the plaintiffs first proved, that on the 19th of April, 1822, they advanced to *Folwell,* and for his accommodation, their promissory note for one thousand seven hundred and eighty-six dollars and forty cents, for which he gave them a receipt, stating that he was " to account to them for it, and pay when due, or from funds shipped *Horatio Sprague,* Gibraltar." This accommodation note was renewed on the 2nd of July, 1822, by another note, and a receipt given, by which *Folwell* agreed to provide for it.

On the 1st of August, 1822, the debt on which the present claim

(Perit and another *v.* Pittfield and others.)

arose, was incurred. The plaintiffs gave *Folwell* their promissory note at ninety days, and he delivered to them a receipt in writing of the same date, stating, that he had " indorsed for it a bill of lading of goods, shipped Medora a collateral," until he paid said note, it being for his accommodation. On the 30th of October, 1822, *Folwell* and the plaintiffs executed the following instrument under seal.

" Whereas, I, *John Folwell,* of the city of Philadelphia, am indebted to *Perit* and *Cabot,* in the sum of one thousand dollars, which debt arises from their note to me, dated 1st of August, 1822, at ninety days date, for the sum of one thousand dollars, which note I borrowed and received for my use and accommodation, which is discounted in the Bank of the United States. And whereas I am possessed of certain goods and merchandize, which have been consigned to *David Correy* and Co. of Port au Prince, in the island of Hayti, and whereas, by letter of the said *David Correy* and *Co.* dated, September 25th, 1822, they advise that they shall ship in coffee, one thousand dollars or thereabouts, on board the schooner Good Friends, *J. J. Whelen,* master, to sail for Philadelphia about the 15th of October, the same being on account of sales of merchandize received. And whereas, I am desirous of securing to the said *Perit* and *Cabot,* the full amount of the said note, of one thousand dollars, which becomes due and payable on the second day of November next. Now these presents witness, that I hereby assign and set over to the said *Perit* and *Cabot,* whatever merchandize may be held by *David Correy* and *Co.* of Port Au Prince, on my account, or the proceeds of any merchandize which I have consigned to the said *Correy* and *Co.,* by the Good Friends, or any other vessel, or vessels, and the coffee or other merchandize, which they or their agents may have shipped on my account, on board the schooner Good Friends, or any other produce which they may have shipped by any vessel or vessels, to have and to hold for the payment of the said debt due to them of one thousand dollars. And I hereby agree to hand over to them the bills of lading of such property whenever they may be received by me. And it is hereby understood, and expressly agreed, that whatever sum or sums may remain in the hands of *Perit* and *Cabot* from the nett proceeds of said coffee, or other merchandize, over and above the payment of the one thousand dollars, is to be returned to the said *John Folwell* or his assigns. Witness our hands and seals, this 30th day of October, 1822."

*Folwell,* on the 7th November, 1822, made a general assignment to the defendants, *Pittfield* and others, for the payment of his creditors, without preference, and without stipulating for a release. The coffee, consisting of forty-five bags, afterwards arrived by the schooner Good Friends, and was charged by the consignors *Correy*

(Perit and another *v.* Pittfield and others.)

*&· Co.*, in their account with *Folwell*, at one thousand and forty eight dollars, including costs and charges. It was received by the plaintiffs, and sold by them on the 15th of November, 1822, for nine hundred and sixty dollars and ninety-six cents, to *Robert Adams*, a merchant in Philadelphia, taking his note for that amount payable at sixty days. It was admitted that *Adams* was then in good credit, and that the sale was made in the usual course of business. In the plaintiffs' book of sales, it was headed: "sales of forty-five bags of coffee per schooner Good Friends, *Whelen*, from Port Au Prince for account and risk of Mr. *John Folwell*." Before the note became due *Adams* failed, and it remained unpaid.

*Folwell's* assignees declared a dividend of twenty-five per cent on the 16th of April, 1823. On the 25th of August, in the same year, *Adams* paid the plaintiffs a dividend of twenty per cent, on his note for nine hundred and sixty dollars, amounting to one hundred and ninety-two dollars and eighteen cents. On the 12th of April, 1825, the plaintiffs received from *Adams* another dividend of thirty per cent, amounting to two hundred and eighty-eight dollars and twenty-eight cents, in respect to which the following agreement and letters were in evidence.

"At a meeting of my creditors on the 6th inst. at the Merchant's Coffee-house, it was agreed, that a compromise in the payment of my debts was advisable : and a resolution moved and carried, that thirty-three and a third per cent should be received from me on the balance due, payable in my notes, at six, nine, twelve, fifteen and eighteen months, indorsed by *John Welsh*. But, on further consideration, and with the advice of some of my creditors, I have thought out of my present estate, I may be able to pay thirty per cent, on the original amount of my debts that I have already paid twenty per cent dividend on, making in all, fifty per cent to my general creditors. And this I concur in, and now engage to make said payment as before mentioned, and when agreed to on the part of all my creditors, I will hand them over the new notes, and cancel the evidence of their claims they now hold against me.

"*Robert Adams.*

"I agree,                         9th March, 1824. '
*John Welsh*."

"We the creditors of *Robert Adams*, as aforesaid, do agree to his proposal of compromise, as above stated.

Signed (amongst others,)
*Perit & Cabot*."

On the 9th of September, 1824, the defendants addressed the following letter to *Robert Adams*:

"Dear sir : if you are indebted to the estate of *John Folwell*, we

hereby agree to release you from the same, the debt being placed on the same footing with that of the other creditors.

*Robert L. Pittfield,*
*James Schott,*
*Samuel Smith,*
Assignees of *John Folwell.*"

The defendants on the 20th December, 1824, declared another dividend upon *Folwell's* estate, of seven and a half per cent.

The plaintiffs further gave in evidence, the following letter from *Robert Adams,* to the plaintiffs' counsel, dated the 21st of December, 1831.

"Dear Sir: I received last evening your note of yesterday, and so well is my receipt book put away, that after the most diligent search, I am unable to lay my hands on it, nor can I imagine where it is, nor how it has got misplaced. The receipts were in the usual or common form, signed by Messrs. *Perit & Cabot,* I well recollect, without reference to any thing; and so was the agreement between my creditors and myself, as to the compromise of fifty per cent. signed *P. & C.* But I well remember, that Mr. *Perit,* I I think it was, remarked to me, that it was a business others were interested in, and they could only act, (*P. & C.,*) with their concurrence. They mentioned Mr. *Schott's* name, and the impression on my mind is, they spoke of Mr. *John Folwell's* estate. I lament I cannot find the receipt book, and will still look for it.

*Robert Adams.*"

*Dunlap* and *J. C. Biddle* for the plaintiff.

On the 7th of November it was plain that *Folwell* would not repay his note of one thousand dollars, and the plaintiffs were bound to sell the coffee to reimburse themselves.

They stood in the light of a factor, to whom the principal was indebted, and held the coffee as a collateral security. A person borrowing an accommodation note, is debtor to the lender the moment he receives it, and obtains the money from Bank. *Pennsylvania Bank* v. *M'Calmont,* 4 *Rawle,* 307. The question is, was the coffee given in payment of the note, or as collateral security. The evidence shows it to have been collateral. The receipt for the note speaks of it as collateral. If other property was substituted, it partook of the same character. The reserving the surplus interest of the proceeds, shows that *Folwell* still had an interest in it; it was to be sold for his benefit. Collateral security is only a pledge, it is not payment, unless so specially agreed. If a chose in action, is transferred by debtor to creditor, the presumption is that it was not in payment, unless the contrary be shown. *Lees* v. *James,* 10 *Serg. & Rawle,* 307. Even acceptance of a sealed agreement does not extinguish the debt, if taken as a collateral security. *Charles*

*v. Scott*, 1 *Serg. & Rawle*, 294.　*Roberts* v. *Gallaher*, 2 *Wash. C. C. R.* 191. It is contended that the discharge of *Adams* by the plaintiffs, released the debt, but it cannot be denied, that before receiving the thirty per cent, they had the authority of *Folwell's* assignees to do so, who therefore, cannot now object to it as wrong.

*Purdon*, for the defendant.

This is an effort by plaintiffs, after having received property to the amount of their debt, and losing that property, to indemnify themselves. There is no equity in their claim. They had a preference beyond other creditors. They chose to take the risk of the property to pay their debts, rather than come in with the others. The assigned property was a payment in discharge of the debt. It was as much payment as money if agreed to be so taken.

The inquiry is, what on the face of the agreement under seal, was the intention of the parties. The general assignment is not used to give the plaintiffs a preference, but a special agreement is used to give the property. The recital and the *habendum* show that the property was intended to be taken in full. There is no power of redemption reserved to *Folwell*.

The law of factor and principal, does not apply. The plaintiffs were not factors to sell the goods, having a *lien* for advances. It is merely the case of debtor and creditor, the creditor having a security in property that would command value immediately in the market. If the plaintiffs owned the coffee, they cannot charge the disbursements on it. *Chipm. Cont.* 73.

If the principal puts in the hands of the surety the means of payment, the taker becomes principal. *Monroe* v. *Wallace*, 2 *Penn. Rep.* 173. He further cited, 8 *Serg. & Rawle*, 458. 13 *Serg. & Rawle*, 159. *Holmes* v. *D'Camp*, 1 *Johns. Rep.* 34. *Garlick* v. *James*, 12 *Johns. Rep.* 146. 8 *Mass. Rep.* 150. *Cortelyou* v. *Lansing*, 2 *Caines' Cases*, 200.

He moreover argued, that the release of *Adams* by *Perit & Cabot* was a bar to this action. The evidence shows that they agreed to the compromise, the 9th of March, in their own capacity, and released in the same capacity. *Folwell's* assent was only conditional.

The opinion of the Court was delivered by

Sergeant, J.—Who after stating the facts, proceeded as follows: The defendants contend in the first place, that by the assignment of the 30th October, 1822, the property in the coffee was transferred to the plaintiffs, and received by them in full satisfaction and discharge of their debt from *Folwell*, so that the debt was extinguished. The sale of the coffee to *Adams* was on the plaintiffs'

own account and at their risk, and they have no claim to a dividend on the funds assigned by *Folwell.* But on considering the previous transactions between the parties, the tenor of the assignment itself, and the rights and obligations it created, it would seem that the property was transferred merely as a collateral security, and being disposed of fairly and in the course of business, and a loss incurred without the fault of the plaintiffs, the original debtor remained liable for the balance unpaid. The general principle is, that property placed by the debtor in the hands of the creditor is not to be construed as received in full discharge of the debt, unless that plainly appears to have been the intention of the parties. In *Charles* v. *Scott,* 1 *Serg. & Rawle,* 296, certain engravings were placed in the hands of the defendant, by agreement under seal. The late Chief Justice Tilghman says, " the. justice of the case would require that the plaintiff should receive the amount of the debt and no more, unless the contrary was the agreement of the parties; and the court, in a doubtful case, should construe the writing so as to produce justice." *Leas* v. *James,* 10 *Serg. & Rawle,* 314, is another case in which the question was, whether a bond assigned was received as absolute payment, or only as a collatral security; and the Chief Justice says, " in cases where a chose in action is assigned by the debtor to the creditor, I think the presumption is that it was not intended as an absolute payment unless it is so expressed. The .reason of such presumption is, that such assignment is not, in its nature, a payment. It puts no money in the hands of the creditor, but only gives him the means of collecting money from another. If these means fail, therefore, without the fault of the creditor, there is no reason why the original debtor should be discharged."

In the present instance we find *Folwell* previously borrowing the plaintiffs' note, engaging in confidential terms to provide for it if not paid out of funds shipped to Gibraltar. When this note of one thousand dollars was originally obtained, the security of goods by the Medora is expressly declared to be a collateral. The assignment of the 30th October was but a substitute, without any reason, so far as we can perceive, for changing the nature of the security. It is true a writing under seal was adopted in lieu of the loose receipt before employed. But *Folwell's* approaching general assignment, by which the control of his property would pass into the hands of strangers, might be thought to require a more formal arrangement than the slight evidence previously given, without presuming that any change was contemplated it its operation.

The assignment recites that *Folwell* was desirous of securing to *Perit & Cabot* the full amount of their note, and transfers the property to them " to have and to hold for the payment of the debt." It comprehends, not as has been suggested, merely coffee, a specific article in possession, for the coffee had not then arrived ; it is a gen-

eral transfer of merchandize consigned to *Correy & Co.*, and its proceeds, and of coffee or other goods shipped by them : an executory contract ; a chose in action.   All this property was then distant or afloat ; the bills of lading not come to hand, its quantity or value not ascertained ; whether it exceeded the debt or fell short of it was uncertain.   It is therefore, not to be supposed, that either party could mean it to be satisfaction of the debt at all events.   And it is sufficiently plain, from the latter part of the assignment, that *Folwell* still meant to retain an interest in the property transferred. It is there stipulated, that whatever sum may remain in the hands of *Perit & Cabot* from the nett proceeds of the coffee or other merchandize, over and above the payment of the one thousand-dollars, is to be returned to *Folwell* or his assigns.   The plaintiffs were not to be the absolute owners ; they were to account to *Folwell* or his assigns for any proceeds that might accrue beyond their debt.   But how was the value of the merchandize to be fixed, so that the nett proceeds could be ascertained ?   The parties obviously contemplated a sale for the purpose, and under this reservation the plaintiffs in fulfilment of the trust they had undertaken, were not only authorised but bound to sell such merchandize in a reasonable time, and account to the principal for the proceeds.   They *could not treat the property as exclusively their own.*   They could not legally use it or destroy it.   *Folwell* and his assigns had an interest in the result of a sale ; they had a qualified property in all merchandize that arrived : and I see no reason why, if they had chosen, they might not, before sale, have tendered to the plaintiffs the amount due to them for their debt and charges, and demanded the coffee ; and if the article were rising rapidly in price, it might have been their interest to do so. A view of the whole transaction presents the case of a transfer of an interest in general merchandize as a collateral security, settling with sufficient precision the respective rights of the parties, constituting the assignee not the sole, but the qualified owner, bound to sell the merchandize when received and account to the assignor for its proceeds.   The relation of debtor and creditor still continued between them ; and the assignee, having sold fairly, on the assignor's account, and a loss happening without his fault, the debt to him remains, and no more of it is cancelled than the amount of money received from the estate of the vendee.

It is further contended by the defendants, that even if the debt still subsisted, after the assignment of the 30th October, it was discharged by the compromise of the 9th March, 1824, made by the plaintiffs with *Adams,* by which they agreed to receive an additional thirty per cent, and release him from the residue.   How far these acts if done without the concurrence of the plaintiffs would have the effect contended for, it is unnecessary to inquire, because there are other circumstances to be taken into view in deciding this case. The letter of *Adams* shows, that the plaintiffs at the time of agreeing

(Perit and another *v.* Pittfield and others.)

to the compromise, intimated that *Folwell's* assignees were interested, and that the plaintiffs could act only with their concurrence. It was perhaps, for that reason the notes which by that arrangement *Adams* was to deliver, were not delivered to the plaintiffs, but the thirty per cent was paid to them in money in April 1825, some time after the defendants had executed to *Adams* a release of the debt, so far as they were concerned in it. It would seem, therefore, that the arrangement of March, 1824, between the plaintiffs and *Adams*, was contingent, depending upon the assent of the defendants, and before it was carried into effect that assent was fully given. All parties probably considered it best to save something from the wreck of *Adams's* estate by coming in with his other creditors, and releasing, rather than risk the loss of the whole : and all deemed the assent of the defendants an indispensable preliminary to the completion of the compromise. It is doubtful whether it would have been completed by the plaintiffs without such assent. I look upon the receipt of the money by the plaintiffs in April 1825, as authorised by the respective parties to this suit, and the defendants therefore, cannot now aver it to be a discharge of the estate of *Folwell* from liability for the difference remaining due on the note.

In relation to the sum on which the dividends claimed in this suit should *be calculated,* the rule has been recently laid down by this court in the case of the *Bank of Pennsylvania* v. *M'Calmont,* that when more than one of the persons liable to the payment of a note have made voluntary assignments for the payment of their debts, the amount actually due at the times respectively when the dividends are declared, is to be taken as the sum on which the percentage is to be estimated. This rule seems to apply to the dividends now sued for. Thus, on the 16th April, 1823, when *Folwell's* first dividend was declared, the debt, (with the charges incurred by the plaintiffs,) was one thousand and eighty-four dollars and sixty-three cents; deduct the twenty-five per cent dividend then declared, two hundred and seventy-one dollars and fifteen cents, leaves eight hundred and thirteen dollars and forty eight cents: on the 5th of August, 1823, *Adams* paid one hundred and ninety-two dollars and eighteen cents: this being deducted leaves six hundred and twenty-one dollars and thirty cents. *Folwell's* second dividend of the 28th December, 1824, seven and a half per cent on this sum, forty-six dollars and fifty-nine cents, being deducted, leaves five hundred and seventy-four dollars and seventy-one cents. *Adams* paid a second dividend 12th April, 1825, which leaves two hundred and eighty-six dollars and forty-three cents, then due to the plaintiffs, without calculating interest on the dividends now claimed. This must be added from the time they were declared, and for that amount judgment be entered for the plaintiffs.

Judgment for plaintiffs.